Good morning. My name is Dean Stewart. I'm here on behalf of Dennis Bright. With the court's permission, I think I'd like to reverse the two issues we're looking at this morning and talk about the forfeiture restitution issue for just a moment. First off, let me concede that I think the government is correct that the district court could order restitution in the entire amount rather than limited by the counts, and they've convinced me, as has U.S. v. Grice, and let me concede that off the bat. However, I don't agree with any of the rest of their position. First, in terms of an objection that I may have made or not made, I would direct the court to the ECR, page 11, one sentence, wherein we stated, as a clarification, defendant believes that all of the funds seized from him by the postal inspectors are or should be available for restitution. I think that's as close as I got to an actual, I object, so I'm stuck with that record, and I wish it was better, but that's where we are. I would submit that that is certainly enough to alert the district court to the issue. We had the hearing on it, and I would submit that it's enough. Now, in terms of the actual funds that were seized, what we have is Mr. Bright gaining these funds through fraud, the postal inspectors then coming in and seizing them, and then the postal inspectors taking them. They're gone. All versions of victim restitution acts have as their core making the victims whole again, or as best that one can do that, and the problem is the U.S. postal inspectors here completely frustrated that by taking administratively all of these funds. As I hope is apparent from the record, none of us really knew this was happening. Certainly not me, not the probation officer, and I think both the pre-sentence report and our filings indicate that this was a total surprise. I think the expectation of the government, the court, and counsel was that the postal inspectors would simply be holding onto these funds until the criminal case, in fact, was resolved one way or the other. If this were the drug case, I think that's absolutely pro forma and would have happened without question, but what happens is to the surprise of everyone, apparently this administrative wheel continues to roll and we lose, the victims lose the funds and my client gets stuck with this rather large restitution order. So what's happened is the postal inspectors have gained a windfall here of almost $100,000 and my client is now stuck with this very large restitution order. My client, of course, is a registered nurse with a felony on his record. The chances of him being able to make these victims whole are probably pretty slim, probably pretty slim. So as a result of the administrative wheels that we didn't even know were turning, we were disadvantaged, the victims were disadvantaged, and it's a most unfortunate situation. My suggestion to Judge Stotler as a cure was simply to order the postal inspectors to turn the money back over to the government for distribution to the victims, and she declined. Did she say she had to do that or it was within her discretion? Within her discretion to do that. And if the point was to make these victims whole, it would have made sense to, in fact, make that order. Perhaps if she'd made that order, you'd now be speaking to government counsel representing the Postal Service saying that was an illegal order. But I don't see anything, I haven't seen anything from the government that would indicate she didn't have the power to, in fact, make that order. Mr. Stewart, are you asking us to order the forfeited amounts returned to you or to require the judge to subtract the forfeited amounts from the total amount of the crime? Actually both, Your Honor. And I guess it comes to two different issues. One is the guideline issue and the other one is the restitution issue. On the restitution issue, we're asking that Judge Stotler should have ordered the money turned over to, I guess it's actually the U.S. Attorney's Office, for distribution the way restitution funds are normally distributed. But then separate and apart from that is the guideline issue as to whether that should have been deducted from the amount. Our position is that it should have been, and under 2F1.1, the old 2F1.1, Application Note 8, it talks about recovering value for the victims. Here, if this money, the almost $100,000, had been redistributed to the victims, clearly there's value in the money, and then by our view of it, it should have been deducted from the loss amount, which is one of the three. But that was within her discretion not to do that. I would suggest it wasn't, Your Honor. It seems to me that had the court made the order to turn the funds back over, well, I guess thinking about it, it probably was within the court's discretion. That's right. Of course, Your Honor, you aren't pointing to the Constitution or to a statute or even a sentencing guideline that says she's required to do that. No, no. It's something within her discretion. No, and in fact, I think it's interesting to note that neither the appellant or the appellee were able to cite any cases on this area at all. And I think the reason for that is that the normal forfeiture situation would have been held in advance and nothing would have happened here. We would have all had this money, which is what we expected. It's a very unusual circumstance. Are you familiar with the Ninth Circuit case of the United States v. Feldman? It's not hitting me off the top of my head, Your Honor. It's not right on point, but it's a RICO case where the district court ordered forfeiture of over a million, almost $2 million under the RICO statutes, and it also imposed restitution in the same amount. And this court upheld that. Your Honor, in this case, it's somewhat unique in that we have the pot of gold. We have the almost $80,000, $90,000 there. This is not a speculative amount or an amount that in the future may be part of a restitution that the defendant would fork over. It's right there. And that's really the sad part of this is the victims had this money right there, and it could have gone directly to them at that time. And unfortunately, that didn't happen because of the unusual posture of this case. One other thing I would note for the Court is that we're not really even sure what What we have is, I think, in the addendum to the pre-sentence report, a one or two sentence line from probation saying it's our understanding from talking to the case agent that this has, in fact, happened. But like so much else in this case, and what I'd argue on the guidelines side of things, there just wasn't sufficient proof to even know that the money was, in fact, forfeited. We have no documentation. The government came forward with nothing other than basically hearsay through probation, through the postal inspectors. And that really kind of brings me over into the guideline arguments, the three areas where we felt there should have been a deduction. And I recognize that we have to win on all three of these issues in order to get underneath $500,000 for guideline purposes. But each one of them has some merit. The one, certainly, that Judge Stotler called close was the refunds to customers. Again, we've got the problem that there was no proof that my client was trying to lull or otherwise keep the scheme going by doing these refunds. What we have is a conclusion by a case agent, parroted back by the probation officer, accepted by the district court. And even under the lowly standard of preponderance, I would suggest that that's just not enough. All three of my issues, in terms of the guideline deductions, are pinned upon the lack of evidence that the court relied upon here. And I concede that the preponderance standard has done take a whole lot. But it takes more than we see in each one of these, particularly as to the refund aspect of it. The refunds were made after the victims discovered that they had been defrauded. No, Your Honor. No, Your Honor. These were all refunds that were happening before the government discovered it. Okay, that wasn't what I said. The victims discovered it, though, didn't they? Well, I don't think they discovered a fraud, Your Honor. But they discovered something wrong because they asked for their money back. Well, either that or they didn't like the program. This wasn't what I thought it was supposed to be. I misunderstood it. You misrepresented it perhaps. We don't know. The bottom line is the refunds were coming back as a result of the request of the customers. There's no showing that there was some specific fraud discovered by a victim and they said, you're defrauding me, give me my money back. It was more, I'd like a refund, okay, here it comes. But under Stoddard, the defendant is entitled to credit for refunds paid prior to discovery of the offense, right? I think it's by law enforcement, Your Honor. By law enforcement. I think that's what Stoddard says. If it doesn't, that's what it should say. Okay. I'll concede that. As to the co-defendant's theft of approximately $25,000, again, we're faced with a situation where it's a he said, she said. There's a bold statement in the pre-sentence report. Our position is the thefts by the co-defendant were absolutely unforeseeable and therefore should not be. But why should your client get credit for money that's been stolen from him that's not his money, but it's money that he's stolen from others or defrauded from others that's been stolen by his co-defendant? Our theory is that he didn't in fact have anything to do with the receipt of the money coming back in. And this perhaps gets back to the refund aspect of things. Maybe these were people that he would have said, okay, you can have your money back. But he never had the opportunity to do that because he didn't even know the money was coming in. It's a completely separate scheme. And I think I've just about run out of time. Counselor, I would like you to, if you would address for just one second why the forfeited funds should be subtracted. I understand on the restitution part. Now, why for sentencing purposes should he get credit for funds that are not his under any circumstances? Yes, Your Honor. I understand that. And this gets back to that application note in the old 2F1.1. I think the application note really was having in mind the sale of property and the proceeds being credited off. That sort of thing. Value received back for the victim. Here perhaps I'm expanding it a little bit farther than the application note intended. But our theory is that the victims are getting value back. They're getting cash back where they should have got cash back. Therefore, much like a real estate situation where the property is sold and the equity goes over to the victims, here the pot of money is coming back to the victims. And therefore, under 2F1.1. Why should that reduce the magnitude of the crime if you're committed by your client? I don't think it does. But I think under the guidelines scheme, in fact, under the old 2F1.1, it was contemplated that that value should be deducted. Perhaps that's one of the reasons we don't have 2F1.1 anymore. There were a lot of problems with that particular guideline, and maybe that's one. Okay. Are you okay? Yes, sir. Thank you. Thank you. Good morning. May it please the Court. My name is Edward McGaugh. I'm the Executive Assistant U.S. Attorney in Los Angeles, and I'm here representing the United States today. If perhaps I can pick up on the last point Mr. Stewart was discussing with the Court with respect to the issue of the forfeited funds and their relationship to the calculation of the loss for purposes of the sentencing guidelines. As our brief points out, we do believe that Mr. Stewart's reading of Application Note A does expand it beyond its plain terms. The note itself gives an example which talks about the fraudulent sale of securities in the amount of $40,000, which have a worth of only $10,000, pointing out then that the loss for purposes of the guidelines would be $30,000, not $40,000. I think the point of the note is pretty plain. That is, if the victim receives some value as a result of the criminal transaction at issue, the fraudulent transaction at issue, then that value should be subtracted and the victim or the loss calculation only include the amount that was a true loss to the victim. The note does not in any way talk about some value the victim may get as a result of some prospective recovery by way of restitution or something else, some recovery by the government. In this case, the loss to the victims was the full amount taken in each transaction. So 8A really has no application here and the full amount of the forfeited funds should have been, as the district court did, included in the loss calculation. And it certainly wasn't clearly erroneous to do that. It wasn't a definite and firm mistake to do that because that's money the victims did lose. The victims paid in that $86,000 and got no value for that. So if they had actually made some money on this investment, you're saying that value that they actually got would have been deductible. And Judge Stotler did deduct that $4,000. But to the extent it speculated the chance to make money, you can't put a value on that. It's speculative. Or where in this case where there's really no value to the victims, the government as part of its investigation recovers some money in a seizure. That's not value to the victims. That's a loss to the victims. The victims may or may not get that back in terms of restitution as we see in this case. On that issue, I'm generally familiar but not specifically familiar with the uses that the Department of Justice puts the victim forfeiture funds to. In this case, he's arguing the forfeiture that Judge Stotler should have had that money transferred to the U.S. Attorney so that it could be applied to actually compensate the victims. Is there any authority for that? Does the Justice Department seek to trace those funds and make them available to the specific victims instead of putting them in the general victims fund? At the time, the forfeiture statutes in effect at the time of this case did not permit that, Your Honor. They have subsequently been amended. I believe it was the CAFRA amendments in 2000 or 2001. Now do permit forfeited funds to be then, I think their term might be remitted. Pardon myself if I'm not using the term in the technical sense, but remitted to be used for restitution. I think that amendment was made to address the situation where there has been forfeiture, an illegal forfeiture, there was no authority to order those funds to then be used for restitution. If I may pick up on that point, I think Mr. Stewart is correct. In my experience, this is an unusual situation. Typically, forfeitures, when funds are seized, the forfeiture is held in abeyance during the pendency of the criminal case for many reasons, one of which being so that those funds will be available for restitution if the defendant is convicted at the conclusion of the case. That's a policy decision that when a punitive sanction, which forfeiture is. Forfeiture is in the nature of a punitive sanction just like a fine. There's a policy decision that as opposed to the United States taking the money as much as we would like it, the victim should get it first. But that was not legally required. The forfeiture in this case, there's been no showing that it was not legally done. And if the forfeiture was legal under those forfeiture statutes in effect at the time, I don't believe Judge Stahler had the authority, the plenary authority to order the United States Postal Service to turn that money back. Was that ever raised before Judge Stahler? I mean, counsel has suggested that that's what his argument was. Was there a debate before Judge Stahler as to claiming that money and getting it allocated to the victims? Regardless of whether it gets counted on the sentencing side of things, was there any effort on behalf of the victims to get that money to them? No. No, Your Honor. It was just as we got to sentencing, we all discovered that this had happened. The money was not available. And really at the time of sentencing, the argument really made was not so much with respect to what impact these funds should have on restitution. The real argument was if you look at the totality of the record is it went to the loss issue. And the fact that the government had recovered this money should reduce the loss. With respect to restitution, the defendant's argument really was a broader just generally, I don't have the ability to pay. I'm just curious here because I know in the U.S. Attorney's offices there are positions, maybe it's a development post this case, but I don't think so, where there's a victims coordinator and the like. Now, it wouldn't necessarily, not necessarily, and we'd expect it to come from the defendant in the case to argue that the victims should be beneficiaries of his forfeited funds. It seems to be the government who might be raising that in this particular case to say, look, we have these forfeited funds over in the U.S. Postal Service, and they ought to be allocated, claimed, remitted, whatever, whether or not there is CAFRA that now actually permits it. Are you telling us that there was no authority on the part of the government to make that argument? That's what I found here. And I'm sorry if I misunderstood your earlier question. I researched it as best I could and didn't find any authority. Then, as the record reflects at the time of sentencing, I advised Judge Stotler that I had consulted with the chief of our asset forfeiture section, who would certainly be more expert than me, explained the circumstances, explained we wanted to get this money, wanted it to go to the victims. And he said, unfortunately, under the pre-CAFRA regime, there was no authority, no way to advise Judge Stotler how to accomplish this. If there had been, we would have certainly recommended that. But the fact that there was, I want to emphasize the point, the fact that there was a forfeiture does not mean there can't be restitution. As Your Honor pointed out, while I was not specifically familiar with the Feldman case, I was going to make the point that there are two different sentencing procedures, two different sentencing options, and they can both be utilized in the same case. It's not uncommon for that to happen, and they do serve two different purposes, one being punitive, that is the forfeiture, and one being to make the victims whole, that being restitution. So the fact that there was the forfeiture in this case, albeit inadvertent but apparently legal, does not mean then that the restitution order should be effected. That was entirely within the court's discretion to do so, to order that restitution. I'm still trying to pursue this other thing. Just to clarify, where do the forfeited funds wind up then? If they're taken by the U.S. Postal Service, where do they go? In this case, it would have gone to the Treasury. Well, not the Department of Justice, General, but I believe it would have gone to the Department of Treasury. Whoever has control over the Postal Service budget, which I believe is Treasury. So again, it wasn't even within something where justice could perhaps pursue it if we had wanted. If I can turn quickly to the other two components of the loss issue. First, as to the refunds, I would disagree with Mr. Stewart as to the quality of the proof. As you recounted accurately for the panel, the court's finding that these refunds were made to lull or in furtherance of the scheme or to prevent detection, which would mean under the law that they should not be credited against the loss, was based on a statement from the case agent to the probation officer. In United States v. Burns, this court held that case reports, a district court may rely, doesn't have to of course, but a district court may properly rely on statements in case reports to support findings at the time of sentencing. I would submit that there's not a great deal of difference between an agent's written statement in a report and an agent's verbal statement to the probation officer. This was not something that the probation officer, the important point being, came up on her own. This was something that she put into the addendum based on a conversation with the agent. And the only reason it was in an addendum was because the issue didn't come up until the actual precepts report had been prepared. So I think it's really a statement in the nature of any other factual statement in the precepts report, which was certainly within Judge Stotler's discretion to credit or not. With respect to the loss, the $25,000 allegedly diverted by the co-defendant, Mr. Chandler, again as we noted in our brief, he denied that. And Judge Stotler was certainly entitled to credit his denial. But more importantly, those funds were lost by the victims as the result of the execution of a scheme devised and put in place by the defendant. As the panel pointed out to Mr. Stewart, I don't think it makes much difference to the victims that perhaps after their money was taken from them illegally that someone took it from the defendant illegally. And I see my time has run, so unless the panel has any other questions for me, I'm prepared to submit. Hearing none, thank you. Thank you. I'll submit as well, Your Honor. All right, fine. Thank you. The case just argued will be submitted, and we thank counsel for their arguments.
judges: Fisher, Bybee, Mahan